UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY COVINGTON,

               Plaintiff,                         Civil Action No.
                                           09-CV-12685

vs.

                                           PAUL D. BORMAN
                                           UNITED STATES DISTRICT JUDGE

RAINBOW APPARREL OF AMERICA, INC.,

               Defendant.
_____/

## OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

This is a premises liability case.  Plaintiff Mary Covington, a 72-year-old female, claims that she sustained injuries when she slipped and fell on a wet mat on the floor in the entranceway of Defendant Rainbow Apparrel of America, Inc. ("Rainbow" or "Defendant"), a clothing store located in Highland Park, Michigan.  Defendant argues that it is entitled to summary judgment because (1) Plaintiff cannot establish that the wet mat caused her fall, (2) the mat was an open and obvious danger, and (3) Plaintiff cannot establish that Defendant had notice of any dangerous condition.

Defendant filed a Motion for Summary Judgment on August 26, 2009 [docket entry 4].  Plaintiff filed a response and Defendant filed a reply.  The Court heard oral argument on this matter on November 12, 2009.  For the reasons that follow, the motion will be denied.

1

## II. BACKGROUND[1]

On December 1, 2005, Plaintiff went shopping with her daughter, Cynthia Covington ("Cynthia"), and her two granddaughters, Jasmine ("Jasmine") and Jalissa ("Jalissa") Covington (collectively, "the Covingtons").  The Covingtons drove together to a strip mall located on Woodward Avenue in Highland Park, Michigan.  Rainbow is one of several stores located in the strip mall.

The Covingtons shopped at Rainbow on two separate occasions on December 1, 2005. Cynthia testified that the Covingtons arrived at the strip mall and entered Rainbow for the first time at about 3:30 p.m.  Cynthia Dep. at 8.  Jasmine testified that it was about 2:00 p.m.  Jasmine Dep. at 7.  It is undisputed that at all times relevant, Plaintiff was an invitee of Defendant.  Also, as discussed in more detail below, there was a mat or rug on the floor in the entranceway of Rainbow at all times relevant.  It is this mat on which Plaintiff allegedly slipped.

According to Cynthia, it was lightly snowing when the Covingtons first entered Rainbow, and had been for approximately 30 minutes.  Cynthia Dep. at 9-10.  Jasmine testified that it was snowing at a "medium" pace, that it had been snowing for "quite awhile" or "hours," and that the snow had started to stick to the ground.  Jasmine Dep. at 8.  The Covingtons shopped at Rainbow for about 20 or 30 minutes, without incident, before leaving to shop at other stores located in the strip mall.  Cynthia Dep. at 11-12; Jasmine Dep. at 11.  Cynthia and Jasmine testified that they noticed nothing unusual about the mat when they entered Rainbow for the first time that day. Cynthia Dep. at 13-14; Jasmine Dep. at 11.  Jalissa testified similarly, stating that the mat was not wet when she and her family first entered Rainbow.  Jalissa Dep. at 20.

---

[1] The background is gleaned from the parties' papers and the evidence attached thereto.

2

After leaving Rainbow and shopping at other stores for a period of time, the Covingtons returned to Rainbow at about 6:00 or 6:30 p.m.  Cynthia Dep. at 17; Jasmine Dep. at 15-16.  Cynthia could not remember if it had been snowing at the time, how cold it was outside, or if there was any snow on the ground; although she did remember that the ground was wet.  Cynthia Dep. at 17-19.  Jasmine testified that it had been snowing continuously at a medium pace since the Covingtons left Rainbow the first time, that there was an accumulation of around two inches of snow on the ground, and that the ground was wet.  Jasmine Dep. at 16.[2]

The Covingtons walked into Rainbow that evening through the front door in the following order: Cynthia, then Plaintiff, then Jasmine, then Jalissa.  Cynthia Dep. at 19; Jasmine Dep. at 17.  Everyone agrees that the front door was the only available entranceway.  Cynthia described the lighting in the entranceway as "kind of dim," "a little dimmer than [the average lighting for a store]," although she admitted that she had no problem seeing where she was walking.  Cynthia Dep. at 15-16.  Immediately inside the doorway were two security detectors.  *Id*. at 12.  In between the doorway and the detectors was the only entrance to the store, and it contained a floor mat.  *Id*.[3]  It is undisputed that customers entering the store had to walk over the mat in order to enter the store.

Cynthia entered the store first.  After entering the store and walking through the security detectors, Cynthia testified that she "heard a loud thump."  *Id*. at 22.  She then turned around and

---

[2] Plaintiff attaches as Exhibit 3 to her response brief weather records from the National Climatic Data Center.  The records indicate snowfall and mist in Detroit during the afternoon hours of December 1, 2005.

[3] Plaintiff attaches as Exhibit 1 to her response brief three pictures of the entranceway of Rainbow.  These pictures exemplify the area in question and the placement of the mat, although everyone agrees that the mat shown in the pictures is not the same as the one that was present on the day in question.

3

saw her mother, Plaintiff, on the floor.  *Id*.  Cynthia did not actually see her mother fall.  *Id*. at 23.

Nevertheless, when asked what caused her mother to fall, Cynthia testified as follows:

> Q:      What caused your mother's fall?
>
> A:      That rug that they call a mat.
>
> Q:      And, what about the mat?
>
> A:      Where I noticed that my mom–When I heard the thump and I turned
>         around and seen she was on the floor, I ran over there where she was
>         to find out what happened.  And, I looked at the mat.  I touched the
>         mat.  It was full of water, a lot of water.
>                 When she slipped on the mat, the mat moved with her . . . out
>         of the spot that it was in.  And she, in turn, fell to the right.  She fell
>         over on this big piece of wood where they stood their mannequin.

*Id*. at 24-25.  Later in her deposition, Cynthia testified that when she turned back to see what had

happened, she saw the mat "scrunched up" on the floor and noticed that it was not in the position

that it had been moments earlier when she walked over it.  *Id*. at 52-53.  Cynthia further stated that

the mat looked as though it "had skidded and slid across the floor."  *Id*. at 53.

    Cynthia also physically inspected the mat.  When she touched it, Cynthia testified that it was

"full of water," *id*. at 24, and that "water was dripping from it," *id*. at 53, like a "soaked sponge."

*Id*. at 54.  However, Cynthia testified that she could not tell that the mat was wet by looking at it.

*Id*. at 34.  Moreover, according to Cynthia, the mat did not have a rubber backing or non-skid

material on either side of it; it was merely "[s]ome type of cloth or rug substance," a "piece of

carpet."  *Id*. at 35, 55.

    When asked again if she saw her mother fall, Cynthia answered that she did not.  *Id*. at 25.

The following exchange then occurred:

> Q:      [Plaintiff] may have tripped, right?

4

A:     I couldn't say.  I don't know.

\* \* \* \*

Q:     Your mom could have tripped over her own two feet, correct?  Isn't it possible?

A:     No.  No.

Q:     Why isn't it possible?

A:     Because my mama had her balance before this accident.  She could walk in a straight line.

Q:     How do you know your mother had her balance right before the accident?

A:     She came in the door behind me.  It was nothing wrong with her.

Q:     I understand that.  But, you were walking in front of her with your eyes to the back of the store.  You were not looking at your mother as she was walking in the store, correct?

\* \* \* \*

A:     That's correct.

Q:     Okay.  So, how do you know your mother didn't lose her balance?

A:     Because my mama had her balance.  There was no reason for her to lose her balance.

Q:     Your assuming that she had her balance, correct?

A:     No.  I know she did.

Q:     And, how do you know?

A:     Because I walk with my mom every day.

*Id*. at 25-27.

Cynthia also testified as follows regarding the number of people who were present in

5

Rainbow at the time:

      Q:    Were there any other customers in the store?

      A:    I didn't pay attention.

      Q:    Did you see any other customers in the store, that you remember, at this point in time?

                     * * * *

      A:    When I went up to the counter for the manager to write the statement that she was going to give me, two women came out of the dressing room.

                     * * * *

      Q:    – do you remember seeing any other people come into the store that were customers?

      A:    Yes.

      Q:    What is a lot or just –

      A:    It was two.

      Q:    Okay two.  And, in the period of time that you were there, the only people that you remember being in the store other than employees and the people that were with you, were two people who were already in the dressing room?

      A:    Right.

                     * * * *

      Q:    And, presumably, if they're in the dressing room, they had already been at the store for some period of time, correct?

                     * * * *

      A:    Yes.

      Q:    People don't go into the dressing room to try on clothes unless they've generally been in the store, at least for a period of time,

correct?

* * * *

A:     Yes.

Q:     Okay.  It wasn't like they had just walked in just ahead of you?

A:     No.

* * * *

Q:     So, whatever condition the mat was in had, apparently, been that way for some time?

A:     Yes.

*Id*. at 46-49.

Jasmine and Jalissa entered the store behind Plaintiff and were therefore in a position to observe Plaintiff's fall, unlike Cynthia who entered the store ahead of Plaintiff.  Jasmine testified that as she was entering the store, she saw her grandmother suddenly "lean to the right."  *Id*. at 19.  According to Jasmine, she "tried to catch her, but . . . couldn't" and her grandmother fell to the ground.  *Id*. at 19, 21.  When asked what caused her grandmother to fall, Jasmine testified as follows:

Q:     So, you don't know if your grandmother tripped over her own feet, as opposed to slipping?  Cause you don't know what caused the fall, correct?

* * * *

A:     Yes.  I know she slipped on that mat.

Q:     Okay.  But, you didn't see her slip, correct?

A:     I did see her slip, just underneath – Well, I can see that she slipped on that mat.

7

> Q:      But, you weren't looking at her feet?
>
> A:      I wasn't looking at her feet.
>
> Q:      So, you're assuming that she slipped, correct?
>
> A:      Okay.  It's an assumption.

Jasmine Dep. at 22-23.  Further, Jasmine answered "yes" when asked if she "could look down at the mat and see that it's wet."  *Id*. at 18.  However, later in her deposition, Jasmine testified directly to the contrary:

> Q:      And when you said you could tell that it was wet, could you tell that
>          it was wet by looking at it right away, or could you tell it was wet by
>          stepping on it and seeing that water was kind of squishing as you
>          stepped?
>
>                              * * * *
>
> A:      Once you step on it.
>
> Q:      Okay.  But, just looking at it plain, you may not have been able to tell
>          it was wet, correct?
>
> A:      Correct.

*Id*. at 38.

Jasmine also testified that after her grandmother's fall, she "looked closely at the mat" in order to "know exactly what happened."  *Id*. at 24-25.  Jasmine's inspection revealed "[t]hat the mat was just very wet, squishy, and it was like a lot of slush from shoes, obviously coming from outside, just pouring off."  *Id*. at 25. While Jasmine did not pick up the mat, *id*., she testified that it did not have any type of rubber coating or non-skid material on it.  *Id*. at 37.

As noted above, Jalissa entered the store last and, like her sister, had an opportunity to observe her grandmother's fall.  Jalissa testified, in pertinent part, as follows:

Q:     When you walked into the store the second occasion, were you walking with your eyes in front of you and looking at the backs of your family members?

A:     Yes.

Q:     Okay. So you didn't look down at the floor or at the mat at the time, correct?

* * * *

A:     Yes, that's correct.

Q:     And then at some point in time, do you recall your grandmother losing her balance? Something happened to your grandmother?

A:     She slipped.

Q:     Now, did you — when you say, "She slipped," is that a conclusion you drew after she already fell?

A:     No, during.

Q:     And how could you tell it was during that she slipped?

A:     I watched her fall.

Q:     Okay. You watched her fall. But as you stated earlier, you weren't looking at the ground or at her feet; is that correct?

A:     No, I wasn't looking at her feet, but I was looking at her.

Q:     And from her body movements, you believe she slipped, correct?

A:     Yes.

Jalissa Dep. at 12-13. While Jalissa never personally inspected the mat, she testified that she could tell that it was soaking wet when she stepped on it and when her mother lifted it up. *Id.* at 20. However, Jalissa testified that otherwise, she could not tell that it was wet. *Id.*

9

Plaintiff was also deposed.[4]  Plaintiff testified that she was looking straight ahead, and not down at her feet, as she was entering the store.  Pl. Dep. at 22-23.   Plaintiff further testified that she could not tell that the mat was wet until after she fell, *id*. at 28, 48-49, and that she does not know how long the mat was wet before the incident.  *Id*. at 38.  Additionally, Plaintiff testified that she did not trip over her feet, but rather slipped and fell because the mat was soaked with water, causing the mat to skid.  *Id*. at 37-38, 52-53.

Bronse Gavin, a sales associate at Rainbow on the date of the incident, testified that he observed the incident in question and that Plaintiff did not fall:

> Q:  What did you see happen when [Plaintiff] walked in?
>
> A:  When she walked into the store she was – she was about to fall.  She – her relatives caught her and she – and she hold on to the sensormatic thing and at the time, her relatives said that she – "she fell, she fell," but . . . she did not fall.  She did not fall on the concrete or nothing, sir.
>
> Q:  Okay.  You say she didn't . . . fall to the ground?
>
> A:  She did not fall period.  She did not –
>
> Q:  You saw her – did you see her lose her balance and jerk but hold herself up, is that what you're saying?
>
> A:  She – right.  She was about to lose her – well, she was . . . about to lose her balance but she was still standing up.

Gavin Dep. at 40-41.  Gavin further testified that he did not see what caused Plaintiff to lose her balance, *id*. at 41, that he could not recall whether the mat on which Plaintiff allegedly slipped had a rubber backing or any kind of non-skid material, *id*. at 34, and that he could not tell the rug was

---

[4] Plaintiff is mute.  Thus, she was asked only yes or no questions during her deposition and she answered by nodding her head affirmatively or negatively.

wet by looking at it.  *Id*. at 54-55.

Finally, Steven Ziemba, a safety engineer and Plaintiff's expert witness, opined as follows:

> [Plaintiff] entered the store . . . and suddenly slipped as she stepped upon a carpet like mat which moved causing her loss of balance and eventual [sic] fall to the floor.

> * * * *

> Th[e] mat was made of carpet-like material, but did not have a rubber molding nor a rubber backing.

> * * * *

> [T]he mat itself moved when [Plaintiff] stepped upon it for one or more of the following reasons.  The mat had no rubber backing to grip the floor surface nor could it lay flat because it laid on top of the metal bar of the anti-theft sensor.  It was not taped down.  The carpet mat became saturated allowing water to pass through the fibers of the mat to the floor beneath or water tracked in and deposited on the portion of the bare floor seeped beneath the mat causing it to slip when stepped on by the plaintiff.

Ziemba Report, Pl. Ex. 9.

### III.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

11

material fact." *Id*. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

**IV. ANALYSIS**

12

## A. The Parties' Arguments

### 1. *Defendant's Position*

Defendant argues that it is entitled to summary judgment for three reasons. First, Defendant briefly argues that its motion must be granted because there is no evidence that the wet mat caused Plaintiff's fall. As stated by Defendant in its brief, "[i]t is undisputed that neither Plaintiff nor her family members saw Plaintiff's feet slip on the subject matter. Notwithstanding this fact, Plaintiff and her family members speculate that . . . [P]laintiff 'slipped' and a 'wet' mat inside the entrance of Rainbow." The Court summarily rejects this argument. While it is true that Cynthia, Jasmine, and Jalissa testified that they were not looking at Plaintiff's feet, or at the ground, as Plaintiff fell, Jasmine and Jalissa both testified that they were looking at Plaintiff as she fell and could discern from her body movement that she slipped on the mat. Moreover, when Cynthia looked behind her to see what happened to her mother, she testified that the mat was "scrunched up" and looked as though it "had skidded and slid across the floor." Cynthia Dep. at 52-53. Accordingly, taking the evidence in the light most favorable to the non-moving party, Defendant's causation argument is clearly unpersuasive.

Defendant mainly argues that it is entitled to summary judgment because the mat was an open and obvious danger and because Plaintiff cannot establish that Defendant had notice of any dangerous condition. With regard to Defendant's notice argument, Defendant argues that "Plaintiff has absolutely no evidence to establish that Defendant . . . knew or should have known that the subject mat was wet" because "Rainbow's employees had no actual knowledge of a 'wet' entrance mat at any time prior to Plaintiff's alleged incident" and "Plaintiff has no evidence to suggest that the defective condition existed, if at all, for a sufficient length of time prior to the alleged accident

to put Defendant . . . on constructive notice of the claimed defect."

In support of its position that the open and obvious doctrine applies in this case, Defendant relies mainly upon two cases, *Maurer v. Oakland County Parks & Recreation Dep't*, 449 Mich. 606 (1995), and *Kennedy v. Great Atl. & Pac. Tea Co.*, 274 Mich. App. 710 (2007) (per curiam), both of which are discussed below.  Defendant also contends that the mat did not constitute a "special aspect."  A special aspect is a condition that "give[s] rise to a uniquely high likelihood of harm or severity of harm" such that if a special aspect exists, the condition is removed from the open and obvious doctrine.  *Lugo v. Ameritech Corp., Inc.*, 464 Mich. 512, 519 (2001).

### 2.  *Plaintiff's Position*

Plaintiff contends that the open and obvious doctrine does not apply in this case for two reasons.  First, Plaintiff states that the evidence is undisputed that the dangerous condition in this case—the soaked nature of the mat and the lack of rubber backing or non-skid resistant material on the mat—were not visible from a walking position and therefore could not constitute an open and obvious danger.  In support of this argument, Plaintiff relies on numerous cases for the general proposition that a danger is not open and obvious where it is not visible upon casual inspection.

Second, Plaintiff contends that this case involves a "special aspect," thereby precluding application of the open and obvious doctrine, because there was no alternative path available to enter the store other than walking over the soaked mat.  Put differently, Plaintiff argues that a "special aspect" exists, thereby removing this case from the ambit of the open and obvious doctrine, because traversing the mat was "effectively unavoidable."  Further, the floor mat did not have any adhesive/adhering backing, thereby creating a high likelihood of harm.

Plaintiff also contends that Defendant's arguments involving notice fail for two reasons.

14

First, Plaintiff argues that she need not demonstrate that Defendant had notice of the dangerous condition because the dangerous condition was created by Defendant.  In support of this position, Plaintiff relies mainly upon two cases, both standing for the general proposition that knowledge of a dangerous condition can be inferred—and therefore need not be proven by the plaintiff—when the condition is created by the defendant.  Second, Plaintiff argues that even if she is required to show notice, the evidence in this case demonstrates that Defendant had constructive notice of the wet mat.

### B. Negligence Generally, and the Duty Owed to Invitees

In order to establish negligence, a plaintiff must show "that the defendant owed a legal duty to the plaintiff, that the defendant breached or violated the legal duty, that the plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered." *Schultz v. Consumers Power Co.*, 443 Mich. 445, 449 (1993).  "The duty element questions whether an actor has a legal obligation 'to so govern his actions as not to unreasonably endanger the person or property of others.'" *Id.* (quoting *Clark v. Dalman*, 379 Mich. 251, 261 (1967)).  "[F]or a duty to arise there must exist a sufficient relationship between the plaintiff and the defendant."  *Id.* at 450.

As noted above, it is undisputed that Plaintiff was an invitee of Defendant.  The duty owed by a landowner to an invitee has been summarized by the Michigan Supreme Court as follows:

> [a] landowner has a duty of care, not only to warn the invitee of any known dangers, but the additional obligation to also make the premises safe, which requires the landowner to inspect the premises and, depending upon the circumstances, make any necessary repairs or warn of any discovered hazards.

*Stitt v. Holland Abundant Life Fellowship*, 462 Mich. 591, 597 (2000).  *See also Lugo*, 464 Mich. at 516 ("a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land").

### C.  The Open and Obvious Doctrine

The duty owed by a possessor of land to an invitee "does not generally encompass removal of open and obvious dangers." *Lugo*, 464 Mich. at 516.  Thus, "where the dangers are known to the invitee or are so obvious that the invitee might reasonably be expected to discover them, an invitor owes no duty to protect or warn the invitee unless he should anticipate the harm despite knowledge of it on behalf of the invitee." *Riddle v. McLouth Steel Products Corp.*, 440 Mich. 85, 96 (1992).  "[T]he 'no duty to warn of open and obvious danger' rule is a defensive doctrine that attacks the duty element that a plaintiff must establish in a prima facie negligence case." *Id.* at 96-96.  In determining whether a danger is open and obvious, the relevant inquiry is: "Would an average user with ordinary intelligence have been able to discover the danger and the risk presented upon casual inspection? That is, is it reasonable to expect that the invitee would discover the danger?" *Novotney v. Burger King Corp.*,198 Mich. App. 470, 475 (1993).

In the present case, the Court finds that there is a genuine issue of material fact as to the applicability of the open and obvious doctrine.  Defendant argues that the doctrine applies because, as stated by Defendant in its brief, "[c]learly, an ordinary prudent person, watching where they were walking, would have been able to notice that the subject mat was wet, and would have avoided that condition."  However, the record in this case is *un*clear on this question.  On the one hand, Cynthia, Jalissa, and even Defendant's own employee, Gavin, all testified that they could not discern that the mat was wet merely by looking at it.  *See* Cynthia Dep. at 34; Jalissa Dep. at 20; Gavin Dep. at 54-55.  On the other hand, Jasmine's testimony is contradictory.  At one point in her deposition, she answered "yes" when asked if she "could look down at the mat and see that it's wet."  Jasmine Dep. at 18.  Yet later in her deposition, Jasmine testified that she could tell the mat was wet only by

16

stepping on it but not by looking at it.  *Id.* at 38.  Given the testimony of these witnesses, there is a factual question as to whether "an average user with ordinary intelligence [would] have been able to discover the danger and the risk presented upon casual inspection."  *See Novotney*, 198 Mich. App. at 475.

Moreover, the two cases on which Defendant mainly relies, *Kennedy* and *Maurer*, do not compel a contrary result because both cases are distinguishable from the present case.  The plaintiff in *Kennedy* was a supermarket shopper who slipped on crushed green grapes or green grape residue on the floor of the defendant's grocery store.  274 Mich. App. at 712.  The trial court granted summary judgment in favor of the grocery store, determining that the crushed grapes or grape residue was open and obvious as a matter of law.  *Id*.  The Michigan Court of Appeals affirmed, noting that the plaintiff testified during his deposition that "he and several other people all noticed the existence of the crushed grapes and grape residue once they actually looked at the floor."  *Id*. at 713.

The present case is very different.  Here, there is conflicting testimony as to whether the soaked nature of the mat could be seen.  Cynthia, Jalissa, and Gavin testified that they could not tell the mat was wet by looking at it.  Jasmine's testimony is contradictory and therefore inconclusive on this issue.  In any event, because there is testimony from witnesses that the hazard could not be seen, *Kennedy* is irrelevant.

The other case on which Defendant relies, *Maurer*, is also distinguishable.  The plaintiff in *Maurer*, in mid-daylight, stumbled and fell on an unmarked cement step in a park.  449 Mich. at 618.  The plaintiff sued the county alleging that it was negligent in failing to mark or warn of the step.  When asked what was dangerous about the step, the plaintiff testified during her deposition that she

17

"just didn't see it." *Id.* at 619.  The trial court granted summary judgment in favor of the county, finding that the step was open and obvious, and the Michigan Supreme Court affirmed, concluding that "[t]he plaintiff's only asserted basis for finding that the step was dangerous was that she did not see it" and that, therefore, "the plaintiff has failed to establish anything unusual about the step" or "present[] . . . facts that the step posed an *unreasonable* risk of harm" *Id.* at 619-621 (emphasis in original).

Again, the present case is very different.  Here, there is testimony from those who were there that the dangerous condition—the soaked mat—could not been seen.  There was no such evidence in *Maurer*; rather, in *Maurer*, "the . . . only asserted basis for finding that the step was dangerous was that [the plaintiff] did not see it." *See id.* at 621.  For this reason, *Maurer* is inapplicable. Because, taking the evidence in the light most favorable to the non-moving party, there is a genuine issue of material fact as to whether the dangerous condition in this case was open and obvious, the Court will not grant summary judgment in Defendant's favor on this basis.

Finally, as noted above, Plaintiff also argues that the open and obvious doctrine does not apply because this case involves a "special aspect."  Taking the evidence in the light most favorable to the non-moving party, the Court also concludes that this case involves a "special aspect."

### D.  Notice

As stated above, "a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo*, 464 Mich. at 516.  To sustain a premises liability action, "[the] plaintiff must show either that an employee of [the defendant] caused the unsafe condition or that a servant of [the defendant] knew or should have known that the unsafe condition existed." *Whitmore v. Sears,*

18

*Roebuck & Co.*, 89 Mich. App. 3, 8 (1979).  "Plaintiff ha[s] the burden of producing evidence sufficient to make out a prima facie case."  *Id.* (citations omitted).  "A prima facie case of negligence may be established by use of legitimate inferences, as long as sufficient evidence is introduced to take the inferences 'out of the realm of conjecture.'"  *Berryman v. K Mart Corp.*, 193 Mich. App. 88, 92 (1992) (quoting *Ritter*, 128 Mich. App. at 786).

In the present case, Plaintiff argues that she need not establish that Defendant had actual or constructive notice of the wet mat because Defendant created the unsafe condition.  As stated by Plaintiff, "[i]t is clear that Defendant's own defective floor mat, devoid of rubber backing or skid-resistant properties, and failure to ever replace mats, were the causes of the accident."  In support of her position, Plaintiff relies mainly upon the Michigan Supreme Court's decision in *Hulett v. Great Atl. & Pac. Tea Co.*, 299 Mich. 59 (1941).  There, the Court held that "Defendant could not by its own act create a hazardous condition and then demand that plaintiff, who was injured as a result thereof, prove it had knowledge of such condition.  Knowledge of the alleged hazardous condition created by defendant itself is inferred."  *Id.* at 66-67.

Defendant, on the other hand, argues that the unsafe condition was caused by a combination of the acts of third parties and weather conditions – in other words, conditions over which the storekeeper had no control – and that Plaintiff must therefore prove actual or constructive notice.  In support of its argument, Defendant relies upon *Hulett* for the following proposition:

> In those cases where the alleged hazardous condition was caused by the acts of third parties or weather conditions or other conditions over which the storekeeper had no control, the plaintiff [is] required to prove that the defendant had notice of such conditions and had reasonable time to correct the same.

*Id.* at 68.

Taking the evidence in the light most favorable to the non-moving party, the Court agrees with Plaintiff and finds that notice may be inferred in this case.  The evidence presented demonstrates that the mat on which Plaintiff fell moved as Plaintiff walked on it, causing her to fall. Cynthia testified that "[w]hen [Plaintiff] slipped on the mat, the mat moved with her . . . out of the spot that it was in" and that when she turned back to see what had happened to her mother, she saw the mat "scrunched up," as if it "had skidded and slid across the floor."  Cynthia Dep. at 25, 52-53. Cynthia examined the mat after the incident and found that it had no rubber backing or non-skid material on either side of it; it was merely "[s]ome type of cloth or rug substance," a "piece of carpet."  *Id.* at 35, 55.  If the jury believes Cynthia's testimony, it could find that Defendant created the unsafe condition by utilizing an improper mat in the entranceway of its store.  In turn, if the jury finds that Defendant created the unsafe condition, Plaintiff need not prove actual or constructive knowledge because, again, "[k]nowledge of the alleged hazardous condition created by defendant itself is inferred."  *Hulett*, 299 Mich. at 67.  Therefore, summary judgment in favor of Defendant on the basis of inadequate notice would be improper.

### V.  ORDER

For the reasons stated above,

IT IS ORDERED that Defendant's Motion for Summary Judgment [docket entry 4] is denied.


s/Paul D. Borman                            
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE


Dated:  November 16, 2009

20

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 16, 2009.


s/Denise Goodine
Case Manager